T.C. Memo. 2007-154

UNITED STATES TAX COURT

WILLIAM C. AND DOROTHY M. SMITH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12065-05.                Filed June 14, 2007.

<u>John P. Konvalinka</u> and <u>Richard G. Pearce, Jr.</u>, for
petitioners.

<u>Travis T. Vance III</u> and <u>Monica D. Armstrong</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes of $8,779, $9,835, and $15,498
and penalties pursuant to section 6662(a) of $1,755.80, $1,967,

and $3,099.60 for the years 2000, 2001, and 2002, respectively.[1] The issues presently before the Court for decision are:

1.   Whether petitioner Dorothy M. Smith's direct marketing activities were conducted with an actual and honest intent to profit.   We hold that they were not;

2.   whether petitioners are liable for penalties pursuant to section 6662(a) and (b)(1).   We hold they are not.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and the accompanying exhibits are incorporated by this reference.   Dr. William C. Smith and his wife Dorothy M. Smith resided in Rossville, Georgia, at the time their joint petition was filed with this Court.

Dr. Smith is a medical doctor and was engaged in the practice of medicine during the years at issue.   Mrs. Smith graduated from college with training as an accountant.   Later Mrs. Smith became a registered nurse and worked as a nurse from 1981 to 1995.   During this period, Mrs. Smith also worked as an administrator with a home health agency.   At the end of this period, Mrs. Smith was earning approximately $75,000 a year.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

During 1996, Mrs. Smith began selling for direct marketing companies. During 1998 and 1999, Mrs. Smith was involved with selling spray vitamins. On Schedules C, Profit or Loss From Business, of their joint Federal income tax returns for 1998 and 1999, petitioners reported losses of $34,049 and $47,493, respectively, related to Mrs. Smith's direct marketing activities.

During 2000, 2001, and 2002, Mrs. Smith stopped selling spray vitamins and instead became involved in four other direct marketing companies: (1) Espial U.S.A., Ltd. (Espial), (2) Renaissance The Tax People, Inc. (Renaissance), (3) Cyberwize.com (Cyberwize), and (4) 24/7 Internet Marketing. The products that Mrs. Smith marketed from Espial included energy supplements, power-oxygenated water, and skin-care products. The products marketed for Cyberwize included nutritional supplements and a travel product. The products marketed for 24/7 Internet Marketing included marketing materials to help recruit other individuals interested in direct marketing opportunities as well as candy and other food products.

The products Mrs. Smith marketed for Renaissance were part of what Renaissance called its "Tax Relief System". Customers could purchase the system, which consisted of various written and audio materials designed to generate Federal income tax deductions, for $300. Mrs. Smith purchased what Renaissance

called the "Founders Pack", which included four Tax Relief Systems that could then be resold.  Among the benefits claimed in the Tax Relief System materials were:  (1) A guaranteed minimum of $5,000 in Federal tax deductions, (2) that participation in the system was itself evidence of operating a business for profit, and (3) that opening a home-based business would allow taxpayers to enjoy double deductions by claiming both the standard deduction as well as itemized deductions claimed on Schedule C.  In addition to the written materials, customers could purchase Renaissance's monthly tax service with costs ranging from $10 a month to the platinum service, which Mrs. Smith purchased, for $100 a month.

As a distributor in a direct marketing operation, an individual commits to purchasing or selling a certain amount of the product each month.  The individual then earns commissions on the products he or she is able to sell.  The individual also enjoys a discount on products purchased for personal use.  In addition to the commissions based on his or her sales, a distributor can earn income by recruiting other individuals to sell the product.  The original distributor then becomes the "upline" distributor and the recruit, the "downline" distributor.[2]  The upline distributor then receives additional

_____

[2]These operations are also sometimes referred to as multilevel marketing companies.

commissions based on the products that his or her downline distributors are able to sell. If a downline distributor then recruits additional individuals to sell, the original upline distributor receives commissions on sales by both downline distributors. The additional commissions received by the upline distributor are not, however, determined by the profitability of the downline distributors, only by their sales.

Mrs. Smith was recruited in this fashion to become a downline distributor for Susan Walsh, first for Espial in 1999, and in subsequent years for Renaissance and Cyberwize. The record does not reflect who introduced Mrs. Smith to 24/7 Internet Marketing. Ms. Walsh provided Mrs. Smith with product training and sales organization training and advised her on how to teach and train other potential downline distributors.

With the exception of Cyberwize, Mrs. Smith created nominal business plans for each of the companies for which she marketed. These plans included vague goals about the number of customers Mrs. Smith would attract and the sales that she would achieve. For instance, Mrs. Smith's Espial business plan is an undated, one-page document which states: "I will build a sales force and retail products to derive income that will exceed employment in the corporate arena, and I will have become a highly visible sales organization known as a leader in sales, sponsorship, team support, and residual income." With respect to her market, Mrs.

Smith's plan states: "My target customer market includes those who would like to own their own home-based business. The ideal customer is one who can benefit from the products or [sic] I am marketing." Mrs. Smith's plans did not reflect any analysis of the market she sought to operate in, any potential competitors, her startup costs, the time required to recoup those startup costs, or the time and potential to achieve profitability. With each of these plans, it seems Mrs. Smith altered existing materials provided by the companies. Mrs. Smith prepared no written business plan for Cyberwize.

Petitioners engaged their accountant, Cheryl Clark, to assist in the preparation of their income tax returns. Ms. Clark is a certified public accountant (C.P.A.) licensed in the State of Georgia. Mrs. Smith provided Ms. Clark with summaries of the expenses and income with respect to her direct marketing activities which Ms. Clark then used to prepare petitioners' income tax returns, including the losses reported on petitioners' Schedules C. The information Mrs. Smith provided was entirely in summary form, and Ms. Clark was not asked to and did not attempt to verify the amounts Mrs. Smith provided her.

In addition to preparing petitioners' returns, Ms. Clark provided Mrs. Smith with tax advice for her business. Ms. Clark advised Mrs. Smith on how best to maintain the business records for her business. When Mrs. Smith was contemplating becoming a

distributor for Renaissance, she engaged Ms. Clark to review her Renaissance business plan as well as other materials provided by Renaissance. This review was confined to the merits and legality of the tax strategies sold as part of the Renaissance tax package. After reviewing the documents Mrs. Smith provided, Ms. Clark advised that the tax strategies promoted by the product were legal. Ms. Clark also purchased the Tax Relief System for herself and briefly became a distributor for Renaissance. Ms. Clark testified that she ceased selling for Renaissance because it was taking too much time and because Renaissance was shut down by Kansas State authorities.

Ms. Clark did not provide any business advice to Mrs. Smith apart from her tax advice. Aside from the vague business plan provided to Ms. Clark with respect to Renaissance, Ms. Clark did not review any of Mrs. Smith's other business plans. Further, Ms. Clark did not prepare or review any financial statements or budgets with respect to any of Mrs. Smith's marketing activities. As Ms. Clark testified, her advice was largely confined to tax advice.

Mrs. Smith also sought advice from her upline distributor, Ms. Walsh. Ms. Walsh's counsel focused primarily on sales and product training. Ms. Walsh did not review any financial statements with Mrs. Smith, nor did she discuss how Mrs. Smith might stem the losses she was experiencing or how long it might

take to recoup the losses.  Instead, Ms. Walsh testified that her advice focused on the future and was directed at how to sell the products and how to recruit others and teach them to sell the products.  Ms. Walsh's advice assumed that sales equal profits without any apparent consideration of the costs associated with realizing such sales.

Mrs. Smith testified that she devoted 60 to 80 hours per week to her marketing activities.  We find Mrs. Smith's testimony unconvincing.  Mrs. Smith testified that a typical day consisted of:

> First of all, I plan my day the night before, and then I would get up, review the plan, and I would be -- actually go through, review the plan, the contacts that I needed to make, what I need to do for that day, and that usually began somewhere between seven and eight o'clock.  Then I, after reviewing what my plan was for the day, I would then begin to make phone calls and confirm appointments and follow through with things that I had planned out the night before.
>
> Then once I made those phone calls, I then would go travel to call on either customers or businesses in order to market the product or return calls to those who had responded to advertising, that type thing. Then in the evenings, a lot of times I would participate in conference calls regarding the business as well, and then that evening, of course, I'd plan my work for the following day.

We do not believe that these activities amount to 60 to 80 hours per week of work time, and there is little documentary evidence, such as logs and calendars, to substantiate Mrs. Smith's testimony in this respect.

The time Mrs. Smith did spend with these direct marketing activities was devoted primarily to recruiting additional downline distributors as opposed to selling the actual products themselves. To recruit additional distributors, Mrs. Smith placed advertisements in the classified sections of local and regional newspapers about joining her marketing organization. For instance, one advertisement under the heading, "Network Marketers" states: "The top trainer in the industry seeks 5 key people in the Nashville area. $25,000/mo. FREE car." Mrs. Smith would then spend time responding to phone calls inquiring about these advertisements as well as traveling to and meeting with these potential downline distributors. Mrs. Smith would also prepare periodic goal sheets, with stated numbers of the sales she hoped to make, and review similar goal sheets prepared by her downline distributors. Finally, Mrs. Smith would meet with other distributors during conferences and seminars.

It is not clear how many downline distributors resulted from these recruitment efforts by Mrs. Smith. Many of her downline distributors did, however, come from among Mrs. Smith's family and friends. For instance, one of the first members of Mrs. Smith's Renaissance team was her husband, Dr. Smith.[3] Another

---

[3]Mrs. Smith offered no explanation of what benefit petitioners might have received from Dr. Smith's purchasing the Tax Relief System when Mrs. Smith had already purchased the system and the platinum level of service.

member of Mrs. Smith's Renaissance team was her friend Walt Holcomb.  Mrs. Smith lent Mr. Holcomb $12,000 in the same year that he purchased the Tax Relief System.

Overall, Mrs. Smith's direct marketing activities have proved unsuccessful.  On the Schedules C of their joint Federal income tax returns for 2000, 2001, and 2002, petitioners reported gross receipts of $19,869, $16,014, and $46,587, respectively, related to Mrs. Smith's direct marketing activities.  For the same years, petitioners reported total losses of $26,856, $34,155, and $17,256, respectively.  These losses included the reported use of 40.48 percent of their residence for regular and exclusive business activity.  The 2002 loss included wages totaling $14,060 paid to petitioners' two sons.

In subsequent years, petitioners' gross receipts from the activities rose to $54,793 in 2003 before falling to $18,294 in 2004 and $17,947 in 2005.  In 2003, petitioners reported that Mrs. Smith's activities broke even.  In 2004, petitioners discontinued claiming deductions for the business use of their residence, car and truck expenses, and supplies and reported a profit of $758.  In 2005, petitioners also stopped claiming a deduction for wages paid to their sons and reported a profit of $7,354.  Mrs. Smith testified that these expenses could no longer be justified as deductions because the nature of Mrs. Smith's

activities had changed such that she was now primarily using the Internet to conduct her activities.

OPINION

A.  Section 183 Generally

Section 183 restricts taxpayers from deducting losses from an activity that is not "engaged in for profit".  Sec. 183(a). An activity is engaged in for profit if the taxpayer entertained an actual and honest profit objective in engaging in the activity.  Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, 78 T.C. 642, 645, (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.  The taxpayer's expectation of profit must be in good faith.  Allen v. Commissioner, 72 T.C. 28, 33 (1979) (citing section 1.183-2(a), Income Tax Regs.).

In deciding whether Mrs. Smith operated her direct marketing activities for profit, we consider the following nine factors: (1) The manner in which she carried on the activity; (2) her expertise or that of her advisers; (3) the time and effort she expended in carrying on the activity; (4) the expectation that the assets she used in the activity may appreciate in value; (5) her success in carrying on other similar or dissimilar activities; (6) her history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which she earned; (8) her financial status; and (9) whether elements of

personal pleasure or recreation are involved.  See sec.
1.183-2(b)(1) through (9), Income Tax Regs.

No single factor, nor even the existence of a majority of
factors favoring or disfavoring the existence of a profit
objective, is controlling.  Brannen v. Commissioner, 722 F.2d
695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec.
1.183-2(b), Income Tax Regs.  Rather, the relevant facts and
circumstances of the case are determinative.  See Golanty v.
Commissioner, 72 T.C. 411, 426 (1979), affd. without published
opinion 647 F.2d 170 (9th Cir. 1981).  On the basis of the facts
and circumstances, we hold that Mrs. Smith was not engaged in her
direct marketing activities for profit within the meaning of
section 183.[4]

1.  Manner in Which the Taxpayer Carried On the Activity

Maintaining complete and accurate books and records,
conducting an activity in a manner substantially similar to that
of comparable businesses which are profitable, and making changes
in operations to adopt new techniques or abandon unprofitable
methods suggest that a taxpayer conducted an activity for profit.
Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-
2(b)(1), Income Tax Regs.

---

[4]We note that petitioners did not argue to shift the burden
of proof under sec. 7491(a).  Regardless, the outcome of this
case is determined on the preponderance of the evidence after
trial and is unaffected by sec. 7491(a).  See Estate of Bongard
v. Commissioner, 124 T.C. 95, 111 (2005).

Mrs. Smith argues that she maintained records consistent with a business operated for profit, including business plans, commission reports from the companies whose products she sold, and 30-day and 90-day sales goal reports, as well as detailed records of her expenses. Further, Mrs. Smith maintains that when the products from one company proved unprofitable, she switched her distribution efforts to other companies which were more profitable.

Respondent, on the other hand, maintains that Mrs. Smith did not operate in a businesslike manner because the records lack any indicia of analysis of the market, the potential for profit, or how to alter the business to make it successful. Respondent argues that the records petitioners did maintain were consistent with someone seeking to substantiate their expenses for tax purposes and not with the goal of making a profit.

Mrs. Smith cites Dworshak v. Commissioner, T.C. Memo. 2004-249, in support of her contention that she was operating her business for profit. The taxpayer in Dworshak, like Mrs. Smith, was a distributor for a direct marketing company and maintained records of his activities. Mrs. Smith argues that the records she maintained were even more detailed than those of the taxpayer in Dworshak. While Mrs. Smith may be correct that she maintained more records than the taxpayer in Dworshak, ultimately she misses the point. As we have stated previously:

the keeping of books and records may represent nothing more than a conscious attention to detail.  In this case, there has been no showing that books and records were kept for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the operation. * * *

Golanty v. Commissioner, supra at 430.

Thus, we found significant in Dworshak not simply that the taxpayer maintained records, but that the taxpayer used those records as a tool to analyze how to make his direct marketing business profitable.  For example, the taxpayer in Dworshak devised a system to keep track of the success rates of his solicitation activities.  As a result, during the first year and a half of his operation, the taxpayer knew that about 2 percent of people to whom he mailed solicitation materials purchased products from him.  When those statistics demonstrated that the success rate for his direct mail solicitations dropped below 0.5 percent, the taxpayer concluded that it would be more effective to use telephone and in-person solicitations.  There is nothing in the record before us that suggests any similar use or analysis of the records Mrs. Smith maintained.

Mrs. Smith's testimony that she switched companies for which she distributed when she concluded that other companies would be more profitable is unconvincing and not supported by the record. There is nothing to suggest any analysis by Mrs. Smith of why she thought Espial and Renaissance were not profitable and why switching to Cyberwize and 24/7 Internet Marketing would prove

more profitable. Indeed the record presented at trial suggests, at least with respect to Renaissance, that Mrs. Smith ceased selling for the company because it was shut down by the Kansas State authorities.

The business plans and goal sheets that Mrs. Smith prepared do not support a conclusion that she was operating her direct marketing activities with the actual and honest goal of making a profit. These business plans were largely prepackaged by the company for which she was selling and were full of vague and unsupported puffery concerning the amount of sales she hoped to make. These purported business plans and goal sheets lacked any analysis of how these vague goals might be achieved, what startup costs were involved, how long it would take to recoup those startup costs, what type of market there was for the products she was selling, or other types of analysis one might expect to find in a genuine business plan. While Mrs. Smith testified that she did these types of analysis, there is nothing to substantiate her self-serving testimony. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986) (noting the Court is not required to accept a taxpayer's self-serving testimony in the absence of corroborating evidence).

In short, we find that the manner in which Mrs. Smith conducted her direct marketing activities, including the maintenance of records without any underlying analysis of how to

make the activities profitable, more indicative of someone preparing for IRS examination than someone with the actual and honest objective of making a profit. Accordingly, we find this factor to favor respondent.

2. The Expertise of the Taxpayer or the Taxpayer's Advisers

Efforts to gain experience, a willingness to follow expert advice, and preparation for an activity by extensive study of its practices may indicate that a taxpayer has a profit objective. Sec. 1.183-2(b)(2), Income Tax Regs. A taxpayer's failure to obtain expertise in the economics of an activity indicates that he or she lacks a profit objective. Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523; Golanty v. Commissioner, 72 T.C. at 432.

Mrs. Smith maintains that before deciding to sell for a company she would meet with representatives of the company, sample its products, and tour its facilities. Mrs. Smith also maintains that she contacted the Better Business Bureau and the Direct Selling Association and that as a result of this preparation she decided not to sell for certain companies. Mrs. Smith further argues that she sought and followed business advice from her upline distributor, Ms. Walsh, as well as her accountant, Ms. Clark.

We find that Mrs. Smith's preparation for her direct marketing activities is not suggestive of someone trying to make

a profit.  Mrs. Smith had no experience operating a direct marketing business at the time she was recruited by her upline distributor, Ms. Walsh.  Despite this lack of experience, Mrs. Smith has principally relied only on advice she has received from Ms. Walsh and other insiders.  While Ms. Walsh had experience as a distributor for direct marketing companies, as Mrs. Smith's upline distributor Ms. Walsh did not need to concern herself with Mrs. Smith's profitability so long as Mrs. Smith was able to sell products or recruit others to sell products.  See, e.g., Poast v. Commissioner, T.C. Memo. 1994-399 ("for the most part, petitioners' advisers were not experts as much as they were upliners with a financial stake in petitioners' retail and downline sales").  Ms. Walsh did not review any financial statements or budgets with Mrs. Smith.  Thus, we took Ms. Walsh at her word when she testified that she was not so much concerned about the past--or Mrs. Smith's previous losses--as she was Mrs. Smith's ability to sell and recruit others.

Mrs. Smith testified that she also sought business advice from her accountant.  However Mrs. Smith was contradicted by Ms. Clark herself, who testified that her advice to Mrs. Smith was largely confined to matters related to the preparation of Mrs. Smith's tax returns.  Ms. Clark did not review any financial statements or budgets for Mrs. Smith, and there is nothing in the record to suggest that Ms. Clark had any experience or expertise

with running a profitable direct marketing business that might assist Mrs. Smith in the operation of her activities.

In sum, we are not convinced that Mrs. Smith sought any counsel from disinterested third parties on how she might make her direct marketing activities profitable. Nor are we convinced that Mrs. Smith tried to educate herself in any meaningful way on the economics of operating a direct marketing business or to overcome her lack of experience and expertise. This factor favors respondent.

3. The Time and Effort Expended by the Taxpayer

The fact that a taxpayer devotes much of her personal time and effort to carrying on an activity may indicate an objective to derive a profit, particularly if the activity does not have substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs.

Mrs. Smith testified that she spent between 60 and 80 hours each week working on her direct marketing activities. Respondent, on the other hand, argues that the time Mrs. Smith devoted to her marketing activities should be discounted because much of the time was pleasurable, included socializing with friends, and had the added benefit of allowing petitioners to claim business expense deductions for many of their personal expenses.

There is evidence that Mrs. Smith devoted a fair amount of personal time to these activities. For instance, Mrs. Smith introduced the message logs of phone calls she received in response to advertisements she placed in various newspapers. Mrs. Smith spent time responding to these telephone inquiries, including identifying leads that seemed promising and scheduling meetings with these leads. We do not believe that Mrs. Smith found considerable pleasure in responding to these telephone inquiries.

The problem is that while Mrs. Smith spent a fair amount of time working on her direct marketing activities, we find her testimony that she devoted 60 to 80 hours per week to these activities lacking in credibility. When asked at trial to describe a typical day, she testified in vague terms about planning, making phone calls, and traveling to meet customers. We are unconvinced that these activities amount to 60 to 80 hours of work a week.

Thus, while we find that Mrs. Smith devoted significant time to her direct marketing activities, any positive inference to be drawn from this factor is tempered by Mrs. Smith's lack of credibility with respect to the number of hours she devoted. Nevertheless, we find this factor to favor petitioners.

4.  <u>The Expectation That Assets Would Appreciate in Value</u>

The expectation that assets used in the activity will eventually appreciate over time may indicate a profit motive. Sec. 1.183-2(b)(4), Income Tax Regs. No appreciating assets were devoted to Mrs. Smith's activities. This factor is neutral.

5.  <u>The Taxpayer's Success in Carrying On Other Activities</u>

The fact that a taxpayer previously operated similar activities profitably may show that the taxpayer has a profit objective. Sec. 1.183-2(b)(5), Income Tax Regs. Far from success, in the 2 years preceding the years at issue Mrs. Smith's direct marketing activities resulted in losses of $34,049 for 1998 and $47,493 for 1999. This factor favors respondent.

6.  <u>The Taxpayer's History of Income and Loss</u>

A history of substantial losses may indicate that the taxpayer did not conduct the activity for profit. <u>Golanty v. Commissioner</u>, 72 T.C. at 427; sec. 1.183-2(b)(6), Income Tax Regs. Losses sustained in the initial stage of an activity, however, do not necessarily indicate that an activity was not conducted for profit. <u>Engdahl v. Commissioner</u>, 72 T.C. at 669. Of course, a series of years where net income is realized would be strong evidence that an activity is engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.

In the years at issue, 2000, 2001, and 2002, Mrs. Smith recorded losses of $26,856, $34,155, and $17,256 respectively.

These losses are on top of the losses of $34,049 and $47,493 for 1998 and 1999. In total, from 1998 to 2002, Mrs. Smith reported losses from her direct marketing activities of $159,809.

Mrs. Smith maintains that while she sustained losses during the years at issue, these losses should be considered startup losses because of the unforeseen circumstances that necessitated finding new companies to sell for. Mrs. Smith further asserts that her business broke even in 2003 and returned profits in both 2004 and 2005.

We are not persuaded that Mrs. Smith's history of losses should be discounted as startup losses because she had to switch companies for which she sold because of unforeseen circumstances. First, the unforeseen circumstance with respect to Mrs. Smith's ceasing to sell for Renaissance was Renaissance's having been shut down by the Kansas State authorities. Further, we find that characterizing these losses as being startup in nature is not supported by the record. Mrs. Smith moved from company to company without any apparent analysis of the costs associated with selling for a new company or how long it might take to recoup those costs. In short, we find these losses were operating losses.

Nor are we persuaded by Mrs. Smith's assertion that her business is now profitable. While Mrs. Smith reported on her Schedules C that she broke even in 2003 and had small profits for

both 2004 and 2005, these numbers are misleading. Beginning in 2004, Mrs. Smith stopped claiming deductions for car and truck expenses, office expenses, and the business use of petitioners' home. In 2005, Mrs. Smith stopped claiming a deduction for wages paid to petitioners' sons. Had Mrs. Smith included these expenses, as she had in the years at issue, her direct marketing activities would have reported a loss.

Mrs. Smith explained that these expenses could no longer be claimed on her return because the nature of her business had changed in that she had become more focused on using the Internet to carry on her business. If anything, however, the fact that Mrs. Smith's activities were focused on using the Internet suggests that she was using her home to conduct her business more than ever.

This factor favors respondent.

7. The Amount of Occasional Profits, If Any

The amount of any occasional profits the taxpayer earned from the activity may show that the taxpayer had a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. Mrs. Smith did not earn a profit in any of the years at issue or in prior years in which she was engaged in her direct marketing activities. While she maintains that they are now profitable, as discussed above, we find her characterization of profits to be unpersuasive. This factor favors respondent.

8. <u>The Financial Status of the Taxpayer</u>

The receipt of a substantial amount of income from sources other than the activity at issue, especially if the losses from the activity generate large tax benefits, may indicate that the taxpayer does not intend to conduct the activity for profit. Sec. 1.183-2(b)(8), Income Tax Regs. Petitioners reported adjusted gross income of $153,351, $150,228, and $179,837 in tax years 2000, 2001, and 2002, respectively. Petitioners offset the losses of $26,856, $34,155, and $17,256 for tax years 2000, 2001, and 2002, respectively, resulting from Mrs. Smith's direct marketing activities against petitioners' income to create substantial tax savings. This factor favors respondent.

9. <u>Whether Elements of Personal Recreation Are Involved</u>

The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational elements involved. Sec. 1.183-2(b)(9), Income Tax Regs.

Respondent argues that because Mrs. Smith focused her activities on developing a downline distributor network, as opposed to trying to sell products herself, the activities involved primarily personal and recreational elements such as dining out, meeting friends, and socializing. Respondent further argues that Mrs. Smith enjoyed personal benefits of being able to

purchase products at a discount as well as claiming business expense deductions for personal expenses.

We find this factor to be neutral. In part, Mrs. Smith enjoyed personal or recreational benefits by engaging in this activity. The record suggests that some of her downline distributors were her friends long before their business involvement with Mrs. Smith. In one case, Mrs. Smith even lent $12,000 to a friend in the same year he became a downline distributor for Renaissance. Further, many of Mrs. Smith's activities included elements of personal recreation, including traveling to different cities and enjoying meals with friends. Finally, Mrs. Smith enjoyed the benefit of being able to claim business expense deductions for personal expenses such as her car and home.

There were, however, elements of these marketing activities which seem to lack any indication of personal recreation, including placing advertisements in newspapers to recruit downline distributors and responding to the resulting phone calls inquiring about these opportunities. Thus, we find this factor to be neutral.

10. Conclusion

On balance, we find that Mrs. Smith was not engaged in her direct marketing activities with an actual and honest objective of making a profit. We do not lose sight of the fact that one of

the four companies that Mrs. Smith distributed for during the years at issue sold a purported product that was nothing more than a tax strategy to convert personal expenses into business expense deductions with a home-based business. We are convinced that this is precisely what Mrs. Smith was trying to do with her direct marketing activities.

In conducting these activities, Mrs. Smith failed to employ elementary business practices that one would expect of individuals pursuing an activity with a profit objective. She bounced from company to company without any apparent thought or analysis of why the new company might help her stop losing money. She spent freely without any evident plan on how she would recoup those expenses. And while diligent in maintaining records, in the face of these year-after-year losses, there is no evidence that Mrs. Smith used those records to analyze the merits of her business: How she might stem her losses; what selling techniques were most successful at achieving sales and at what cost; and how and when she would break even. She did none of the analysis that one would expect someone operating a business for profit to have undertaken.

Finally, the record reflects that Mrs. Smith had been involved in direct marketing activities for 5 years by the end of the years at issue and had not yet made a profit in any of those years, let alone begun to recoup the losses that she had

sustained.  See <u>Bessenyey v. Commissioner</u>, 45 T.C. 261, 274 (1965) ("the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years."), affd. 379 F.2d 252 (2d Cir. 1967).  While Mrs. Smith asserts that her business is now profitable, she no longer chooses to include the expenses that she once considered a part of her business.

In the light of the foregoing, we hold that Mrs. Smith did not have the requisite objective of making a profit with her direct marketing activities.  Thus, petitioners are not entitled to deduct their losses from Mrs. Smith's activities for the years in issue.  However, pursuant to the provisions of section 183(b), petitioners are entitled to deduct expenses to the extent of gross income from the activities.

B.   Accuracy-Related Penalty Under Section 6662

Respondent also seeks to impose an accuracy-related penalty under section 6662(a) and (b)(1) against petitioners because they failed to exercise due care and disregarded the Internal Revenue Code when they claimed personal expenses as business expense deductions through a home-based business.

Section 6662 imposes an accuracy-related penalty equal to 20 percent of the portion of an underpayment attributable to, inter alia, negligence or disregard of rules or regulations.  Sec.

6662(b)(1). The accuracy-related penalty will not be applied to any portion of an underpayment with respect to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1). A good-faith, reasonable reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. United States v. Boyle, 469 U.S. 241 (1985); sec. 1.6664-4(b), Income Tax Regs. Whether a taxpayer relies on professional advice and whether such reliance is reasonable hinge on the facts and circumstances of the case and the law that applies to those facts and circumstances. Sec. 1.6664-4(c)(1), Income Tax Regs.

The record persuades us that petitioners relied in good faith upon the tax advice given by Ms. Clark, petitioners' accountant, when she prepared petitioners' tax returns. Ms. Clark is a C.P.A. licensed in the State of Georgia. Ms. Clark was aware of Mrs. Smith's history of losses. Further, while after careful consideration, we conclude that Mrs. Smith was not engaged in her direct marketing activities for profit, we do recognize that there are indicia of someone operating a business for profit, including the time spent on the activities and Mrs. Smith's out-of-pocket expenses for advertising. Finally, when Mrs. Smith sought advice on the strategies promoted by Renaissance and implemented them in her business, Ms. Clark advised Mrs. Smith that they were legal. While we find this

advice was in error, we note that Ms. Clark had no prior relationship with Renaissance.  On the facts of this case, we find Mrs. Smith's reliance on Ms. Clark was reasonable. Accordingly, we decline to sustain respondent's determination as to the accuracy-related penalties.

To reflect the foregoing,

<u>Decision will be entered for respondent as to the deficiencies and for petitioners as to the accuracy-related penalties</u>.